

**ORDERED in the Southern District of Florida on May 19, 2022.**

_____

**Mindy A. Mora, Judge**
**United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**www.flsb.uscourts.gov**

| | |
|---|---|
| In re: | Case No.: 21-21018-MAM |
| Bensalz Productions, LLC, | Chapter 11 |
| Debtor. | |
| _____/ | |

### MEMORANDUM OPINION AND ORDER GRANTING CREDITOR AND PLAINTIFF BELINDA BAKER'S MOTION FOR ENTRY OF AN ORDER TRANSFERRING CHAPTER 11 CASE TO THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

Some cases are more difficult than others. This is one of the hard ones.

This subchapter V bankruptcy case has all the hallmarks of bad faith litigation and none of the usual indicia of a good faith attempt to reorganize. Debtor Bensalz intends to liquidate. It has a trickle of income and a smidgen of assets. The facts and equities point toward dismissal. But the law provides great leeway to debtors who seek bankruptcy protection, and it is unclear without further evidence whether this

case could equitably proceed as a liquidating case.

This is an urgent question, one the Court wishes it could answer, but it must not. The Court must decide cases based upon the merits and procedural requirements.

With no creditors in the state of Florida, one undisputed creditor in New York, and litigation with its only other creditors pending in New York, Bensalz's decision to file in this district is suspect. Even so, the Court is mindful of the great deference shown to a debtor's choice of venue. For that reason, the Court carefully considered all arguments in favor of retention of venue in this district. The Court nevertheless concludes that the case should be transferred, and that it must entrust the important question of dismissal to its colleagues in the Southern District of New York.

## BACKGROUND

The history of this bankruptcy case reaches much further back than November 19, 2021 (the "Petition Date"). It starts about ten years ago, when Belinda Baker, Starborne Productions, LLC, and Starbreacher Enterprises LLC collectively entered into a series of agreements with Bensalz, Excel Sports Management, LLC, and Bensalz's three principals.

At that time, Richard Bennett served as Bensalz's managing member. Two other individuals, Michael Skouras and Eric Salzman, rounded out the list of members of the limited liability company. Bennett, Skouras, and Salzman organized Bensalz in New York, and established New York as the entity's principal place of

business.[1]

As often happens prior to the filing of a bankruptcy case, things went awry. In Bensalz's world, two major events occurred, both around 2018. First, the reality television show "TANKED!", which Bensalz produced, was taken off the air. Next, Baker commenced litigation against Bensalz.

The cancellation of "TANKED!" adversely impacted Bensalz's bottom line. Bensalz lost its executive producer income as well as income from a talent management agreement with the stars of the show. Since the show's demise, Bensalz has collected a dwindling income from sale of "TANKED!" merchandise and has generated little to no new business. Current monthly operating reports filed in this case reflect income of less than $1000 per month, in sharp contrast to earnings of $96,238 in 2019 (the year just after cancellation).

Litigation with Baker also proved detrimental. The nature of the allegations, which included sexual assault and appropriation of material protected by a non-disclosure agreement, were unsavory. The factual detail in Baker's complaints was graphic and disturbing. In the wake of the "Me Too" era, it was hard to ignore

---

[1] Bensalz's current representation that Florida is its principal place of business is inconsistent with factual findings made in 2020 in a case filed by Baker against Bensalz in the U.S. District Court for the Southern District of Ohio (the "Ohio Court") and with a 2019 sworn declaration filed by one of Bensalz's principals in that case. *Baker v. Bensalz Prods., Inc.*, 480 F. Supp. 3d 792, 796 (S.D. Ohio 2020) ("[Bensalz] is a limited liability company organized under New York law, with its principal place of business in New York."); Declaration of Richard D. Bennett, Jr., dated March 27, 2019, at ¶ 3 (originally filed in *Baker v. Bensalz Productions LLC*, Case No. 1:18-cv-00757 (S.D. Ohio) and later filed as an exhibit in Case No. 1:20-cv-03342-AJN-SN (S.D.N.Y.) at ECF No. 21-3) (the "Bennett Declaration") (stating same).

allegations of criminal and demeaning acts by one of Bensalz's three principals, as well as the silence to date on those same issues by the other two principals. The veracity and enforceability of Baker's allegations, however, was not what this Court focused on in reaching its decision.

The legal issues underlying this decision are simple jurisdictional questions. On February 14, 2022, Baker filed *Creditor and Plaintiff Belinda Baker's Emergency Motion for Entry of an Order (I) Dismissing the Debtor's Chapter 11 Case, or Alternatively, (II) Transferring the Debtor's Chapter 11 Case to the Bankruptcy Court for the Southern District of New York* (the "Motion") (ECF No. 57). On February 28, 2022, Bensalz filed a Response in Opposition to the Motion (ECF No. 62), and a few days later, on March 2, 2022, the Court conducted a non-evidentiary hearing (the "Dismissal Hearing") on the issues raised in Baker's Motion. The Court focused only upon whether immediate dismissal of the bankruptcy case was appropriate and the extent to which venue over the bankruptcy case was proper in this district.

A. Bensalz's Assets

Bensalz holds a modest amount of assets. Its schedules and statements list $1,128.23 in cash and royalties in an "unknown" amount from the defunct "TANKED!" enterprise. Despite few ready assets, Bensalz's principals committed $7,500 to retain bankruptcy counsel in Florida to file a chapter 7 bankruptcy case.[2]

The chapter 7 trustee was not impressed with Bensalz's case. He quickly filed

---

[2] ECF No. 19, p. 6, ¶ 6.

4

a motion to dismiss the bankruptcy case as having been filed purely to delay the Baker litigation pending in the U.S. District Court for the Southern District of New York (the "New York Litigation").[3] In response, Bensalz filed an emergency motion to convert to subchapter V of the Bankruptcy Code, arguing that this bankruptcy case was filed not to delay, but to obtain "relief" from protracted litigation it could not afford to defend.[4]

After a hearing on December 8, 2021, the Court granted the motion to convert. The Court was persuaded to do so based upon representations at that time by Bensalz's counsel that Bensalz maintained its principal place of business in Florida since 2017 and that Bensalz's principals intended to pursue reorganization of the company based upon the income stream created by TANKED! merchandise revenue (which does not appear feasible).[5] However, Bensalz's subchapter V plan tells a different story.

Bensalz's initial plan of "reorganization" was actually a liquidating plan.[6] With

---

[3] ECF No. 6 at ¶ 3.

[4] ECF No. 9 at ¶ 1.

[5] Counsel represented to the Court at the hearing on Trustee's motion to dismiss that Bensalz moved its principal place of business to Florida in 2017, which is incorrect. *See* Bennett Declaration at ¶¶ 1, 3; *see also Baker,* 480 F. Supp. 3d at 796. Counsel also represented that Bensalz had registered with the Florida Department of State, Division of Corporations, which is also incorrect. *See* www.sunbiz.org, last visited May 15, 2022 (no listing by entity name).

[6] *Compare* ECF No. 54, p. 1 ("Debtor's Subchapter V Plan of Reorganization") *with* § D, p. 3 ("The Plan proposes a lump sum payment of $25,000 to be paid within 5 business days of the Effective Date."). And, recently, Bensalz amended its subchapter V plan to clarify that the plan was actually intended to be a liquidating plan. ECF No. 77, p. 2. The amended subchapter V plan further clarifies that the sum of $8,500 would be set aside for Bensalz's general unsecured creditors. *Id.*, p. 3.

no explanation of how the money would materialize in Bensalz's coffers, the plan proposed a distribution of $25,000 to be shared by administrative creditors and general unsecured creditors.[7] At the Dismissal Hearing held about a month after the initial plan was filed, Bensalz's counsel acknowledged that Bensalz's principals would supply the proposed plan funding, but only if the Court allowed the company to proceed with a subchapter V bankruptcy case.[8]

      B.  <u>Bensalz's Geographic Ties</u>

Bensalz has the slimmest of possible geographic ties to the state of Florida. Bennett, the managing member, is a resident of the state. The other two members are not.[9] Bensalz never registered as an entity doing business within the state. And to be clear, it appears that it never will. Although Bensalz argued that it is engaged in "commercial or business activities" sufficient to meet the criteria as a debtor under subchapter V, it also contradictorily argued that those same activities do not warrant registration with the Florida Department of State as an entity doing business within the state.

Other support offered by Bensalz to describe its geographic ties to this district is flimsy. Bank records identified in Bensalz's filings recount a series of withdrawals

---

[7] ECF No. 54, p. 2, Article I, ¶ 2 ("Non-priority unsecured creditors holding allowed claims will receive distributions on a pro rata basis from the $25,000 net of the allowed administrative expenses.").

[8] The Court will note here that confirmation of a subchapter V plan would provide Bensalz with a discharge even in a liquidating case, while remaining in chapter 7 would not. *Compare* 11 U.S.C. § 1192 *with* 11 U.S.C. § 727(a)(1).

[9] Bennett Declaration at ¶ 4.

over the past few years, but no deposits.[10] Bennett made several withdrawals at one or more bank locations near his Florida townhouse. However, Bennett did not make any deposits in the state of Florida into Bensalz's account since 2018, nor did he use the account to pay corporate debts.[11]

Bensalz argued that "decisions" were made in Florida but offered no record of any particular decision made within this district. Bensalz did not describe trips by Skouras (a resident of New York) or Salzman (a resident of Texas) to Florida to conduct business activities. Bensalz does not have any creditors in this district. Bensalz did not rent any commercial office space in this district. Bensalz did not retain any employees in this district. Bensalz has not paid taxes to the state of Florida. In fact, the extent of Bensalz's ties to this district appears to be Bennett conducting calls from his Florida townhome and occasionally withdrawing corporate funds from a nearby bank branch, most recently via an ATM.

On the other hand, Bensalz was organized in the state of New York and its principal place of business is there, at least according to a recent federal court opinion and a declaration signed by Bennett himself.[12] Under oath in 2019, Bennett described

---

[10] ECF No. 62 (the "Response"), ¶ 67 (listing 16 transactions). The only possible deposits described in the Response are entries "a" and "c", which were described as "teller transfer[s]" on January 26, 2018, and February 2, 2018, without any clarification as to where each transfer originated or terminated, or the purpose of the transfers. Because the Response hinted at but failed to describe other deposits or payments of corporate debts, the Court presumes that those transactions (if they exist) were insignificant.

[11] ECF No. 62, ¶ 67.

[12] *See infra* footnote 1. Bensalz did not present documentary evidence demonstrating a change of principal place of business since entry of the Ohio Court's opinion on March 6, 2020, in which the court

Bensalz as "a New York-based company."[13] Bensalz's one undisputed unsecured creditor is the New York law firm, Reavis Page Jump LLP ("Reavis Page"), which represented Bensalz in the New York Litigation.

The list of New York ties continues. New York law governs the agreement between Starbreacher Enterprises (Baker's business entity) and Bensalz.[14] Baker alleged that she flew to New York several times to conduct business with Bensalz and Excel (another New York-based entity).[15] Litigation filed by Baker against Bensalz and others remained pending as of the Petition Date in the Southern District of New York.[16] Skouras, the alleged perpetrator of a sexual assault against Baker, is a citizen of New York.[17] The alleged sexual assault occurred in New York.

In other words, without trying too hard, the Court has uncovered many more ties between Bensalz and the state of New York than Bensalz and the state of Florida.

---

found that Bensalz's principal place of business was New York.

[13] Bennett Declaration at ¶ 1.

[14] Claim No. 2, pdf p. 59, ¶ 11 ("This Agreement shall be governed by the laws of the State of New York … and all parties consent to the jurisdiction of the courts of said State in the event of any dispute hereunder.").

[15] Baker's Third Amended Complaint in the New York Litigation alleges that Excel and Bensalz partnered on business projects. ECF No. 172 in Case No. 1:20-CV-03342-SJN-SN, ¶¶ 10, 30-32.

[16] Bensalz moved to dismiss Baker's complaint from the Ohio Court by alleging lack of personal jurisdiction. *Baker*, 480 F. Supp. 3d at 800, 807-08. As support for that position, Bennett submitted the Bennett Declaration, which averred under oath that New York was Bensalz's principal place of business. The Ohio Court relied upon that statement to formulate its opinion. *Id.* at 796. Following entry of the Ohio Court's order of dismissal, Baker filed the New York Litigation, which was styled as *Baker v. Bensalz Productions LLC,* Case No. 1:20-CV-3342, in the U.S. District Court for the Southern District of New York.

[17] Bennett Declaration at ¶ 4.

The record to date indicates that if the Court were to dig any deeper, it could find even more connections to New York. The most important point to grasp, however, is that all four of Bensalz's creditors are either located in or connected to New York.

ANALYSIS

With that backdrop, the Court's analysis does not need to be labored. The facts indicate two things. First, this case seems to be an attempt to circumvent the pending New York Litigation with Baker and cap damages at an amount that Bensalz's principals find palatable. Second, Bensalz filed this case in Florida despite the existence of significantly stronger ties elsewhere.

Although more than one venue option is both possible and permissible for some debtors, the circumstances in this case indicate that selection of a Florida bankruptcy forum was strategic. The disturbing part is not that a debtor made a venue choice, which is permissible for any debtor who might have more than one venue option. Rather, the selection of venue appears designed to have handicapped existing litigation (perhaps for the ultimate benefit of Bensalz's principals) without regard to any *business* purpose. Bensalz is, after all, a business entity. This is part of why the Court strains to understand why Bensalz would incur attorney's fees and propose plan contributions that exceed the cost of paying Bensalz's one undisputed creditor, Reavis Page, in full.

At its core, the Bankruptcy Code and all related bankruptcy rules—including those regarding venue—serve the public policy of fostering a solid economy by permitting worthy debtors to make a fresh start. That is not what is on display here.

The equities of this case favor transfer of venue to the Southern District of New York and suggest that dismissal may ultimately be appropriate.

A. <u>Dismissal</u>

The Motion sought either dismissal of the bankruptcy case or transfer to a more appropriate venue. Because the Court has determined that transfer of venue is appropriate, it will avoid a detailed discussion of the facts showing that the filing itself may have been a sham. The Court feels obliged, however, to make a few points.

1. <u>Numbers Do Not Lie</u>

First, the finances of this case suggest a calculated ploy by Bensalz's principals to cap any damages arising from the New York Litigation. That financial strategy in the abstract is not necessarily a problem in bankruptcy. What makes it difficult to swallow here, however, are the strings tied to a subchapter V discharge.

Bensalz has very meager income. Bank transactions recited in Bensalz's Response to the Motion show that, at least since 2018, dribbles of money have come out and little to no money has gone in.[18] From a financial standpoint, Bensalz appears to be a dried-up entity shell linked to a business whose purpose has ended. If that is the case, then it is not surprising that its principals have not made significant capital contributions in recent years.

That begs the question of why Bensalz does not just seek administrative dissolution? Why file bankruptcy at all? The limited pool of creditors is not clamoring

---

[18] ECF No. 62, ¶ 67.

to reach Bensalz's paltry income stream. Three are litigation creditors seemingly all controlled by Baker and the fourth creditor is Reavis Page, Bensalz's counsel in that same lawsuit. Based upon this fact alone, the choice to file bankruptcy looks suspect. But the Court acknowledges that managing litigation costs and damage exposure is a valid business justification for filing bankruptcy as a general proposition. That is why the Court investigated the numbers more deeply.

What the Court found, upon closer inspection, is that Bensalz's principals— who seemed not to have put any money into the business in years—were initially willing to commit at least $32,500 to file bankruptcy and fund a subchapter V liquidating plan. From an abstract financial standpoint, this commitment doesn't make business sense.

Bensalz's one undisputed creditor, Reavis Page, claims to be owed $30,250.[19] Simple arithmetic shows that Bensalz's principals are willing to fund $2,250 above and beyond the amount of Reavis Page's claim if that contribution will limit damages in the New York Litigation. The major driver for the bankruptcy filing appears not to have been to wind down Bensalz, but rather to shield the principals from any trickle-down effect of the New York Litigation.

None of this financial maneuvering is troubling from a bankruptcy standpoint until two things become apparent: First, Bensalz's principals are prepared to kick in funds to pay its creditors (including Reavis Page) on the condition that the entity is

---

[19] Claim No. 1-1.

guaranteed a discharge (that it doesn't particularly need, since it doesn't intend to reorganize). Second, the $25,000 plan contribution provided for in Bensalz's initial subchapter V plan was <u>inclusive</u> of administrative expenses, and Bensalz's bankruptcy counsel previously estimated that bankruptcy fees for his firm and the subchapter V trustee in Bensalz's bankruptcy case would total just shy of $20,000. That would have left $5,000 available for a distribution to general unsecured creditors. Now, the amended subchapter V plan sets the contribution allocable to non-priority general unsecured creditors at a firm $8,500. That still means that no pre-petition creditor will receive a distribution in the full amount of its claim, not even Reavis Page.

To review these numbers once again, Bensalz's principals paid its bankruptcy counsel a $7,500 retainer to file this case. The amended plan proposes a lump sum payment of $8,500 for general unsecured creditors, and estimates that another $60,000 in fees and costs to the subchapter V trustee and Bensalz's counsel will need to be paid on the plan's effective date.[20] Apparently, within the past few months, Bensalz's principals have committed enough ready cash to pay Reavis Page in full today, but they have chosen not to do so, yet Reavis Page has not complained at all.[21]

---

[20] ECF No. 77, p. 3-4, §§ 3.01 and 3.03.

[21] The potential problem of getting fees paid only if Bensalz is permitted to remain in subchapter V may not be a genuine issue for Reavis Page. That question will need to be addressed on another day and by another court, but it seems likely that Reavis Page may have a way to be made whole. In the Court's experience, most sophisticated creditors (especially law firms) seek a personal guarantee from the principals of a small business entity that stands to incur significant debts, such as professional fees to be incurred in connection with complex litigation. It is possible that Bensalz's principals did not personally guarantee any fee obligations to Reavis Page, but the Court finds that possibility

2.  Possibility of Conversion Instead of Dismissal

At the Hearing, Baker's counsel suggested that reconversion to chapter 7 would also be an acceptable remedy. However, the case has already converted from a chapter 7 to a subchapter V case upon Bensalz's own motion, after the chapter 7 trustee sought dismissal of the case.

Reconversion is an option, but it is a loaded one. Because the case is really a two-party dispute, the primary benefit of transfer to creditors will be the ability to access a longer reachback period in the state of New York. This may pull more money into the estate, but only after significant (and costly) litigation. The case is a two-party dispute with Baker and her entities on one side, and Bensalz and its counsel on the other. Reconversion would thus require a chapter 7 trustee to litigate the merits of Baker's complaint, and those litigation expenses could far outweigh the benefit of victory.

Remaining in subchapter V is questionable from an equitable standpoint, even as to Reavis Page. The proposed amended subchapter V plan provides $8,500 to distribute between Reavis Page, Baker, and Baker's entities, which suggests that Reavis Page could end up with a miniscule distribution given the amount of the damages alleged by Baker and her entities.

All four creditors would stand to benefit if this case were dismissed. Bensalz's principals could pay Reavis Page by redirecting the money that is proposed to fund

---

unlikely.

this bankruptcy case through confirmation of the amended subchapter V plan, and the New York Litigation with Baker and her entities could proceed and reach whatever conclusion is appropriate. The reduction in bankruptcy attorneys' fees would provide an even deeper well from which to draw to settle claims and fund the pending New York Litigation.

Despite the Court's misgivings about the circumstances surrounding this case, there is insufficient evidence in the record to date to definitively determine that dismissal of this bankruptcy case is appropriate. If the Court were to take that path, it would require an evidentiary hearing to give Bensalz every possible benefit of the doubt prior to ending its bankruptcy journey. And, having looked at the entire situation with the most objective stance possible, the Court has determined that the cost/benefit of a full evidentiary hearing is much less rational in Florida versus in New York because all of the parties (including Bensalz) have stronger ties there.

B. Venue

Now the Court comes to the alternative relief sought by Baker, namely, transfer of venue of this case to the Southern District of New York. This is a request that can readily be granted.

1.   Bankruptcy Rule 1014 and 28 U.S.C. § 1408

Bankruptcy Rule 1014 ("Rule 1014") provides the platform for the Court's venue analysis. It states:

> (1) *Cases Filed in Proper District.* If a petition is filed in the proper district, the court, on the timely motion of a party in interest or on its own motion, and after hearing on notice to the petitioners, the

14

United States trustee, and other entities as directed by the court, may transfer the case to any other district if the court determines that the transfer is in the interest of justice or for the convenience of the parties.

(2) *Cases Filed in Improper District*. If a petition is filed in an improper district, the court, on the timely motion of a party in interest or on its own motion, and after hearing on notice to the petitioners, the United States trustee, and other entities as directed by the court, may dismiss the case or transfer it to any other district if the court determines that transfer is in the interest of justice or for the convenience of the parties.

Subsection (1) permits a Bankruptcy Court to transfer a properly filed case to another district if doing so serves the interest of justice or the convenience of the parties. Subsection (2) authorizes the same result if the case is improperly filed and also offers the potential for dismissal.

Because the Court declines to dismiss this bankruptcy case without a further evidentiary hearing, and an immediate transfer serves both the interest of justice and the convenience of all parties, it is immaterial which subsection of Bankruptcy Rule 1014 applies for today's analysis. What carries more relevance is the governing venue statute, which is 28 U.S.C. § 1408.

Section 1408 of title 28 provides that the appropriate venue for cases under title 11 is the district—

(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

Only subsection (1) pertains to this bankruptcy case. The key factor within that subsection is the location of the debtor's principal place of business or principal assets.

2.    Principal Place of Business

Although Bensalz has argued that Florida operated as the principal place of business for at least 180 days preceding the petition date, that assertion contradicts prior sworn statements, record evidence, and a federal court opinion.[22] In order for the Court to accept that the principal place of business recently changed from New York to Florida, Bensalz would need to submit far more evidence. Beyond bald assertions, there is little discussion in the record and no tangible proof of the alleged change.

The Ohio Court conclusively determined that New York was Bensalz's principal place of business on March 6, 2020, or just about a year and a half before the petition date. In its Response to the Motion, Bensalz presented bank records *prior to* March 6, 2020, as proof of the purported "change" in principal place of business to Florida. Only bank transactions *after* March 6, 2020 would have been relevant, and the Response provided only one: an ATM withdrawal on October 14, 2021 for $400. That is simply not enough for this Court to enter a new factual finding contrary to the Ohio Court's prior determination of Bensalz's principal place of business.

---

[22] *See infra* footnote 1.

16

Bensalz argues that Bennett's current residence provides proof of a change in its principal place of business, but that argument is specious. Bennett was a resident of Florida prior to and during the litigation before the Ohio Court. He provided a sworn statement to the Ohio Court proclaiming New York to be Bensalz's principal place of business despite his personal residence in Florida. Based upon that assertion, the Ohio court conclusively determined New York to be Bensalz's principal place of business.

In the Response, Bensalz argued other factors demonstrated that its principal place of business had changed to Florida, but none of those arguments were compelling:

(a) Bensalz alleged that business "decisions" took place in this district. But Bensalz has yet to offer any description of which decisions were made, when they were made, where they were made, how they were made, by whom they were made, and pertaining to what topic.

(b) Bensalz contends that it is conducting business "activities" in this district. Notwithstanding this assertion, Bensalz also claimed that those same activities weren't enough to require it to pay taxes in the state of Florida, register to do business with the Florida Department of State, lease corporate space in this district, or hire employees in this district.

Bensalz's arguments regarding principal place of business seem to shift with the wind, depending upon which court Bensalz is litigating in. Notwithstanding Bensalz's assertion that its principal place of business is now in the state of Florida,

17

this Court finds that the Ohio Court's prior determination judicially estops Bensalz from arguing that New York was not the principal place of business for any time prior to March 2020. *See generally Silva v. Pro Transp., Inc.*, 898 F.3d 1335, 1339-40 (11th Cir. 2018) (describing judicial estoppel). And Bensalz's continuing failure to register with the Florida Department of State, as well as its limited banking activities in Florida since March 2020 confirms that its current principal place of business remains New York unless and until another court rules otherwise. This Court declines to make that ruling.

### 3.    Interest of Justice and Convenience of the Parties

The biggest equitable hurdle to venue in this district is the one plainly stated in the language of Rule 1014 itself: the interests of justice and convenience of all parties (particularly creditors). Although the language of the rule is clear enough, a multi-factor test provides additional guidance. [23] Those factors are:

1) The proximity of creditors of every kind to the Court;
2) The proximity of the debtors to the Court;
3) The proximity of the witnesses necessary to the administration of the estate;
4) The location of the assets;
5) The economic administration of the estate; and
6) The necessity for ancillary administration if bankruptcy should result.

*Townsend*, 84 B.R. at 767. Application of these factors spotlights the propriety of

---

[23] The test pre-dates the present iteration of Rule 1014 but the factors are still relevant. *See* 1987 Amendments to Fed. R. Bankr. P. 1014; *see also In re Townsend*, 84 B.R. 764, 767 (Bankr. N.D. Fla. 1988) (listing factors and citing prior cases); *In re Perdido Bay Country Club Estates, Inc.*, 19 B.R. 1015, 1016 (Bankr. S.D.N.Y. 1982) (same). *But see generally In re Lazaro*, 128 B.R. 168 (Bankr. W.D. Tex. 1991) (discussing amendments to Bankruptcy Rule 1014).

transfer of this case to the southern district of New York.

a. <u>Proximity of Creditors and Debtor to the District</u>

Filing in this district created significant geographic distance between Bensalz and its handful of creditors. Three creditors (Baker and her entities) hired local counsel to represent their interests in this district.[24] This was decidedly inconvenient and expensive, so much so that Reavis Page apparently declined to follow suit.

Reavis Page merely filed a proof of claim. Because Reavis Page is a law firm, this makes sense. What makes less sense is that the parties most impacted by the distance (Baker and her entities) appear to have so far borne the brunt of the inconvenience and expense in terms of Bensalz's choice of forum.

Setting equitable concerns aside, the plain geographic facts still point towards transfer. All of Bensalz's creditors have significant ties to New York. Bensalz itself has continuously engaged in business in New York since its inception. Those two facts satisfy the first two prongs of the multi-factor test and strongly support transfer.

b. <u>Location of Witnesses</u>

The "location of witnesses" factor is mostly neutral but slightly favors New York. Baker resides in Ohio, Bennett resides in Florida, and Salzman resides in Texas. Skouras, the alleged perpetrator of the sexual assault, resides in New York, and Bensalz maintains its principal place of business in New York. On balance, New

---

[24] Although anyone may file a proof of claim regardless of geographic location, Local Rule 2090-1 requires counsel in other states to associate with local bankruptcy counsel for any ancillary litigation.

York provides the most convenient central venue for witnesses.

c. <u>Location of the Assets</u>

This factor is largely inapplicable. Bensalz had funds in a bank account that were accessible within the state of Florida. It is unclear from the record when or how the bank account was opened, but history indicates that Bensalz opened the account in New York and continued to engage in banking transactions within that state through March 6, 2020.[25] Perhaps a very weak argument could be made that some level of banking in the form of ATM withdrawals within the state of Florida provides a basis for venue, but that statement could be made about any number of persons or entities that have no real ties to this district. The Court thus gives little credence to Bensalz's one post-March 2020 ATM transaction.

d. <u>Administration of the Estate and Ancillary Administration</u>

The most practical forum for economic administration of the estate is New York. The present record indicates that ancillary administration is not an issue.

e. <u>Other Considerations</u>

Of course, there are other details that might make Florida an attractive venue for Bensalz's bankruptcy case. Florida has a shorter reachback period than New York (4 years as opposed to 6 years) in fraudulent transfer litigation. But since Bensalz is proposing to liquidate through its amended subchapter V plan, that distinction

---

[25] This is the date of the Ohio Court's opinion determining that New York is Bensalz's principal place of business.

should not matter to the business, although it very likely was a consideration for Bensalz's principals. The additional two-year reachback period may have inspired Bensalz's principals, who possibly took sizeable distributions prior to 2018, to seek greener pastures by filing bankruptcy in a state with a shorter reachback provision to minimize their potential exposure should a trustee be appointed to recover fraudulent transfers.

<u>CONCLUSION</u>

The Court's analysis describes many facts supporting a transfer of venue in the interests of justice and for the convenience of parties. The Court held a full hearing on the issue of venue. *Griggs v. Kirk (In re Griggs),* 679 F.2d 855, 856 (11th Cir. 1982). The Court has considered the Motion, the Response, all exhibits, and the full record of this Bankruptcy Case.

Ample documentary evidence supports the conclusion that transfer of this case to the Southern District of New York is appropriate. Even after giving great weight to Bensalz's selection of venue and straining to accept the tenuous business justifications offered, the Court cannot condone the end run to justice that tinges every aspect of Bensalz filing its bankruptcy case in this district. *Micci v. Bank of New Haven (In re Micci)*, 188 B.R. 697, 699-700 (S.D. Fla. 1993). As a result, the Court will transfer the case.

The Court therefore **ORDERS** that:

1.      This bankruptcy case (Case No. 21-21018-MAM) is TRANSFERRED to the Southern District of New York.

21

2.      All pending matters, including the objection to claim filed as ECF No. 64 (the "Claim Objection"), are TRANSFERRED in their current status.

3.      The Claim Objection will remain ABATED pending further order of a bankruptcy court within the Southern District of New York.

4.      To the extent not inconsistent with transfer, the Court retains jurisdiction over the interpretation and implementation of this Order.

### 

Copies furnished to:

Joe Pack, Esq.

*Attorney Pack is directed to serve this Order upon all interested parties in compliance with all applicable rules.*